Opinion issued November 18, 2021



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00269-CV

———————————

## IN THE INTEREST OF M.M.M., A CHILD

———————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-00788J**

———————————

## MEMORANDUM OPINION

In this accelerated appeal, Mother challenges the trial court's order, entered after a bench trial, terminating her parental rights to her minor child, M.M.M. In three issues, Mother contends: (1) the evidence is legally and factually insufficient to support the trial court's finding that she engaged, or knowingly placed M.M.M. with persons who engaged, in conduct that endangered M.M.M.'s physical and

emotional well-being; (2) the evidence is legally and factually insufficient to support the trial court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of M.M.M.; and (3) termination of her parental rights was not in M.M.M.'s best interest.

We affirm.

## Background

M.M.M. was born in March 2020, while Mother was incarcerated in the Harris County jail on a charge of aggravated assault with a deadly weapon. Two days after his birth, the Department of Family and Protective Services ("the Department") received a report that alleged neglectful supervision of M.M.M. by Mother. The report stated that Mother had mental health issues, was violent, had a "history of acting out," and that, on December 19, 2019, when she was six months pregnant, she threatened her neighbor with a knife and was charged with aggravated assault with a deadly weapon. This charge resulted in her incarceration at the time of M.M.M.'s birth. The report recounted that Mother threatened "several" hospital staff during delivery and had no place for M.M.M. to go while she was in jail.

On March 17, 2020, the Department petitioned for its appointment as M.M.M.'s temporary managing conservator. The trial court placed M.M.M. in the Department's conservatorship that same day on an emergency basis and later held a

full adversary hearing on April 8, 2020. The trial court found immediate removal was warranted because Mother presented a danger to M.M.M.'s physical health and safety. The trial court therefore named the Department as M.M.M.'s temporary managing conservator and ordered Mother "to comply with each requirement set out in the Department's . . . service plan during the pendency of this suit."

On May 27, 2020, the trial court held a status hearing at which it reviewed the family service plan the Department created for Mother, found the family service plan was reasonable, and made the family service plan's terms a part of its orders. Mother's family service plan, which was entered into evidence, set forth the Department's concerns that Mother had a history of "aggressive and violent behavior which has resulted in significant criminal history including her current incarceration," and that Mother may struggle with unresolved mental health issues. The plan further stated that Mother's "aggressive and violent behavior may potentially cause harm to herself and those around her, including her infant son." The goal for Mother was that she "show that she is able to manage and understand her anger and other emotions are harmful." The Department also aimed "for [Mother] to resolve her unresolved mental health issues and anger so she is able to care for her vulnerable aged child."

As services to achieve these goals, Mother's plan required her to:

- maintain stable housing and demonstrate the ability to create a stable environment for her family;

3

- obtain and maintain stable and verifiable employment for six months, and verify her employment by providing the Department with pay stubs or other proof;

- complete anger management and parenting courses;

- participate in psychosocial and psychological evaluations to address her emotional mental health needs, and complete any recommendations from those assessments;

- refrain from "future criminal activity"; and

- attend "all court hearings, permanency conference meetings, and family visits."

According to the criminal records entered into the evidence, Mother pleaded guilty to the aggravated assault charge and was sentenced to five years' deferred adjudication. Mother also had a prior conviction, in June 2010, for aggravated assault with a deadly weapon. A report from the Child Advocate reflected that Mother was placed on probation for three years because of the 2010 conviction.

The record also contains a Permanency Progress report, filed by the Department shortly before trial on February 19, 2021, which included information about M.M.M.'s progress and placement during the suit, as well as Mother's participation in her family service plan. The report showed that M.M.M. was placed in a foster home shortly after he was placed into the Department's conservatorship and remained in that home throughout the suit. He was described as "a happy and healthy infant," whom his caregivers described as "an easy baby that only cries when he is hungry." The report also noted that, upon release from jail, Mother

4

"immediately" made contact with the Department and began services and visits with M.M.M.

The Department's initial goal for M.M.M. was that he be adopted by a relative, or in the alternative, placed in a relative's conservatorship. Just prior to trial, the Department had begun the process of transitioning M.M.M. from his foster home into his paternal aunt's care. M.M.M. visited with the aunt over the weekends of February 5 and February 11, 2021.

The Permanency Report also recounted that Mother completed a psychological evaluation while incarcerated in the Harris County Jail. As a result of the evaluation, Mother was diagnosed with adjustment disorder, and it was recommended that she complete parenting classes, individual therapy, and a psychiatric evaluation. As of the filing of the report, Mother's progress with relation to these recommendations was "ongoing." Additionally, the psychologist recommended that, "Prior to reunification, if it were to occur, [Mother] would need to demonstrate stability in her mood and behavior, increased knowledge of parenting, and be able to provide a home environment that is safe and protective for [M.M.M.]"

The case was tried to the bench on February 25, 2021. Four witnesses testified at trial: (1) M.M.M.'s caseworker, N. Adams; (2) Mother; (3) M.M.M.'s paternal aunt; and (4) M.M.M.'s Child Advocate, H. Croy.

**1. Caseworker's Testimony**

The Department's first witness was caseworker N. Adams. She testified that when M.M.M. was born, Mother was incarcerated after having been charged with aggravated assault with a deadly weapon, and there was no one available to pick M.M.M. up from the hospital. Consequently, the Department was required to intervene.

Later, Adams contacted Mother at the Harris County jail and obtained the names of Mother's brother and sister, as well as relatives in Georgia. However, none of the maternal relatives satisfied the Department's placement standards. Adams searched for paternal relatives and sent "hundreds of letters" to possible addresses to locate M.M.M.'s Father. Sometime in August 2020, Father responded to one of Adams's letters, but did not express an interest in caring for M.M.M. until his paternity was established.

Adams testified that the Department developed family service plans for each parent. Mother's plan required her to complete parenting courses, therapy, and a psychiatric evaluation and to follow all recommendations from her evaluation. Adams testified that Mother completed a psychological evaluation while in jail, which was the only service available there. Once Mother was released in October 2020, she began participating in the required parenting course and individual therapy. Adams provided Mother with a referral for a psychiatric evaluation, but

Mother had not yet completed the initial assessment at the time of trial. Mother was participating in weekly visits with M.M.M. and obtained stable housing though a subsidized-housing program. However, she had not provided Adams with a copy of her lease and was still looking for employment.

Adams said that on the evening before trial began, Mother was unsuccessfully discharged by Monarch Family Services ("Monarch"), the service provider who was providing Mother's parenting course and individual therapy. Adams explained that Mother was discharged due to her behavior, which included "curs[ing] out . . . [and being] extremely abusive to the provider."

Adams testified that she had spoken to Mother on numerous occasions about the criminal charges that led to Mother's incarceration and later conviction, which Mother explained was due to an ongoing conflict with her neighbor that escalated on the day of her arrest. Adams explained that the Department was concerned about the reason for her incarceration and her "continued display of violence." Adams testified that the charges Mother faced were enhanced due to her 2010 conviction for aggravated assault. Mother pleaded guilty to the aggravated assault with a deadly weapon charge and was on probation at the time of trial. Adams testified that a parent is not effectively able to parent their child if he or she is incarcerated.

Adams said that Mother's behavior caused her to be fearful, even though Mother had never directly threatened her or, to her knowledge, other Department

staff. Mother "lashed out" at Adams during a visit one month before trial. According to Adams, Mother did not like how the person transporting the child looked at Mother, and she spent "the entirety of the visit ranting, cursing, and yelling at [Department] staff," which interfered with her ability to enjoy her "bonding time with [M.M.M.]" Adams testified that she had to "delay the start of the visit until [Mother] was able to be calmed down by her attorney." Although they went forward with the visit, it was "shortened significantly due to [Mother's] behavior." Once the visit began, the interaction between Mother and M.M.M. was "appropriate," and Mother spent time "holding [M.M.M.], speaking to him, walking with him, keeping him engaged."

Adams testified that the reason Mother was recommended to complete individual therapy was to address her anger and adjustment disorder. However, Mother failed to complete that therapy and had not participated in any other mental health treatment. Adams testified that, based on her personal observation, Mother continued to display instability in her mood and behavior, and thus the Department's concerns with Mother's conduct and the reasons M.M.M. was initially placed in its care were still present as of trial. According to Adams, "[Mother] hasn't internalized the therapeutic concept by demonstrating she is able to control her anger and mitigate situations that will cause her to get angry by still having outbursts as recent as yesterday." Adams stated: "[Mother] has not been able to show she can provide a

safe and stable environment for her son . . . due to her behavior and not completing the tasks and services outlined in her family plan of service."

Father completed all the services in his family service plan and was employed. The only outstanding requirement for Father was a home inspection. However, according to Adams, Father was hesitant to have M.M.M. placed in his care because being a "full-time 24-hour caregiver seem[ed] overwhelming to him."

Adams testified that M.M.M. had been in the same foster placement since March 2020, shortly after his birth. Adams testified that M.M.M. was doing well, had no developmental delays, and was engaged in age-appropriate activities like infant swimming lessons. He was "eating very well, sleeping well, [and attending] daycare during the day to interact with other children his age." He was bonded to all members of his foster home and "very happy and comfortable" in that home. Adams testified that M.M.M.'s foster mother provided appropriate care and took M.M.M. to all of his required medical appointments. M.M.M.'s foster family was prepared to provide M.M.M. with long-term care and adopt him.

The Department's initial plan was to transition M.M.M. to his paternal aunt's home, but Adams testified the Department was concerned about the hesitation expressed by Father and M.M.M.'s aunt. The aunt told Adams she would only care for M.M.M. for a short time until he could be placed with Father. The Department, however, wanted to ensure that M.M.M. had a long-term placement where he could

9

live. Father was hesitant to provide the Department with information so that it could conduct a study of his home and expressed on the evening before trial that it was his hope M.M.M. could "go back and forth between his family and the foster family."

On cross-examination, Adams acknowledged that, although Mother was pregnant with M.M.M. when she committed the assault which led to her incarceration, M.M.M. was not "present physically" or "a born person" at the time of the offense, nor did the crime directly involve the child or a child endangerment charge. Additionally, Mother provided names of potential placements and was "very concerned with her child being placed with a relative or someone she knew." While incarcerated, Mother asked Adams for updates and pictures of M.M.M., which Adams provided. Adams also had facilitated weekly visits between Mother and M.M.M. after Mother's release in October 2020. Adams stated that she "did not see any issues with how [Mother] conducted herself during the visits or her interactions with [M.M.M.]" Adams observed Mother attempt to bond with M.M.M., and her behavior during visits was appropriate. Mother brought M.M.M. clothing, diapers, and toys.

During the visit where Mother "lashed out," Adams testified that Mother arrived early for her visit and wanted to attend a part of Father's visit with M.M.M. Adams said Mother "grew upset, confronted us in the hallway, [and] blocked us in the hallway." Further, Adams denied that Mother substantially completed the

10

services required of her during the suit, noting that Mother had been unsuccessfully discharged from individual therapy, had not completed her parenting classes, and though she may have secured housing, had yet to provide a copy of a lease as required by her plan. Adams also did not agree that there was no evidence showing Mother was a danger to M.M.M, stating, "[Mother]'s anger and aggression is a danger to the child."

## 2. Mother's Testimony

The Department next called Mother to testify. She acknowledged that she was six-months pregnant with M.M.M. at the time she committed the aggravated assault for which she was arrested. When asked whether she was concerned at the time about the impact the crime might have on M.M.M., she said, "I never had a weapon." She went on to say that she had been charged twice previously with assault, not including her most recent conviction. She was charged with assault in August 2017, but the charge was dismissed, she said, because she "did it out of self-defense." Mother claimed the 2010 assault conviction was also self-defense and arose out of an abusive relationship. In the ten years before trial, Mother was arrested four times.

At the time of trial, she was serving a term of five years' probation for her current aggravated assault conviction. Mother testified that she completed an anger management class in October 2020 as part of the terms of her probation. Additionally, she was part of the mental health caseload through Harris County

Probation. As part of that caseload, she was required to "be mentally stable," but it was her decision whether to take any medication. Mother testified she took medication for depression after her mother died, but that was about four years before trial and she had not taken any mental health medication since.

When asked why she did not complete individual therapy, Mother answered that there was a "misunderstanding." According to Mother, the service provider said Mother was late and did not connect to a virtual meeting. Mother testified that she was on time, but she told the service provider that she would cancel the session and "find someone else to do my session from here on out." Mother denied that she "cursed [the service provider] out," but acknowledged that she used profanity in their discussion. When asked whether she learned from her anger management classes how to deal with stressful or frustrating situations, Mother stated that she was "more stressed," not angry in this situation, and asserted that she knew "how to stay calm in a situation and respond to people in a calm manner." She described her responses to the service provider as "calm," stating that "because [she] wasn't in front of this person, . . . [she] didn't react in those type of ways." She used profanity because she was frustrated with the service provider, who had twice told Mother she was late.

With respect to her most recent assault conviction, Mother testified that the incident involved a neighbor. She explained that she had twice reported her neighbor to police because he was harassing her. On the day of the assault, Mother called the

12

police to make another report, but they "refused to come . . . because . . . [there] was no physical altercation and they had already been out there twice on the same situation." When asked how the Department could know that she would not be arrested again, Mother said that she did not want to go back to jail and that she had control over her anger.

With respect to her residence, Mother testified that she obtained subsidized housing in January 2021. She described her one-bedroom apartment as "very clean," and that she had food and furniture in the apartment. Her rental cost was paid for through a yearly assistance program and if she obtained employment, she would be responsible for thirty percent of the rent. She testified that she had applied for employment at restaurants and in stores but had not been called back after interviews. When asked how she would provide for her basic needs, Mother stated she was receiving food stamps and free bus passes from a public assistance program. She said that she could provide for M.M.M. because "I can always get employment," and she could receive diapers and daycare fees through the assistance program. She acknowledged, however, that she had been unemployed since her release from jail in October 2020. She said that her sister, who lived out of state, sometimes helped her, and would help if M.M.M. was returned to her care.

Trial was continued to March 16, 2021, and resumed with Mother's testimony. Mother testified that she had recently obtained employment at Goodwill

and began working there two days before trial resumed. She also completed parenting classes and anger management, provided a copy of her lease to the caseworker, and continued her visits with M.M.M. She had one evaluation remaining and was waiting for an appointment to become available. She testified that she completed most of her services since her release and was willing to complete any that remained. She said M.M.M. was familiar with her, was "very attached to [her,] and recognize[d]" her upon sight. She maintained communication with the caseworker during the case and believed she was able to provide M.M.M. with a safe environment. She further testified that she did not have any prior history with the Department and no criminal history involving assault, harm to, or the abuse or neglect of a child.

During cross-examination, Mother gave conflicting answers regarding whether she had any children in addition to M.M.M. When asked whether she gave birth to any other children, her response was that she had no other children "currently with me." When the trial court clarified that the question was not about children in her care but whether she had any biological children other than M.M.M., she said, "I have two." Then, when asked her children's ages, she responded, "I don't have no other kids with me now." The trial court again asked her to confirm whether she had two biological children other than M.M.M. She answered "yes." Then, when the trial court asked where those children were, Mother responded, "what children? My

14

son or who?" Later, in response to questions posed by the Department, Mother denied saying that she gave birth to other children. She testified that she was pregnant five times and gave birth to a live child only once, but later testified she could not remember how many other children she had given birth to because she has had "a lot of pregnancies." When asked again whether she had any children, other than M.M.M., who were living with other people, Mother answered, "Not that I know of" and "no, not in my custody."

### 3.     Child Advocate's Testimony

The next witness called by the Department was the Child Advocate volunteer, H. Croy, who began working with M.M.M. in April 2020. She attended virtual visits with M.M.M. while he was in his foster placement, and she had seen him in person at his daycare. She said M.M.M. was "doing very well in his current placement" and was "very bonded to his caregiver and her children." As to the foster mother, Croy testified, "That's [M.M.M.'s] mom. It's very clear that he sees that." Croy testified that the foster mother provided for all of M.M.M.'s health, physical, and emotional needs, that M.M.M. had no developmental issues, and that he had grown and developed "a lot" while in his foster home. She further testified that it was in M.M.M.'s best interest to remain in the foster home.

Croy said she was unable to have conversations with Mother during the suit because Mother's counsel instructed her not to contact Mother except through

15

counsel. Croy attempted to contact Mother's counsel to speak to Mother, but she did not receive a response. Because Croy was unable to observe any visits between M.M.M. and Mother because of restrictions in place during the COVID-19 pandemic, she could not testify about Mother's interactions or bond with M.M.M. Croy testified that she had only recently learned that Mother had obtained housing, and she had not been able to assess it yet.

Croy testified that Child Advocates believed it was in M.M.M.'s best interest to terminate Mother's parental rights based on her failure to complete the services required of her. Without those completed services, Croy testified that Mother had not established that she "will be able to effectively parent and care for [M.M.M.]" Croy further testified that, during her work on behalf of M.M.M., she became aware that Mother may have another child, a girl aged 13, living with family in Georgia.

After Croy's testimony, Father asked the trial court to accept his irrevocable affidavit of voluntary relinquishment of parental rights, and to terminate his parental rights based on that affidavit. The trial court announced that it would adjudicate Father as the father of M.M.M., based on a prior order establishing his paternity, and that it intended to accept his voluntary relinquishment of parental rights and

terminate his parental rights under subsection 161.001(b)(1)(k) of the Texas Family Code.[1]

## 4.     Paternal Aunt's Testimony

Next, M.M.M.'s paternal aunt testified. The aunt testified that a home study had been completed and approved of her home. She had taken care of M.M.M. during transitional visits, including for the duration of a winter storm in February 2021. However, she intended to be a support system for Father, and after Father relinquished his parental rights, she "no longer want[ed] to be involved." She acknowledged on cross-examination that she never wanted to serve as a long-term placement for M.M.M. Instead, it was her intent to help Father get custody. She expressed appreciation for M.M.M.'s foster mother and agreed that M.M.M.'s foster mother had provided M.M.M. with a good home.

## 5.     Caseworker's Further Testimony

Lastly, the Department re-called Adams. She testified that the Department's files contained biographical history showing Mother had an older daughter, who was 13 years old and lived with her biological father. Adams testified that she spoke to Mother "early on in the case" about the whereabouts of the older daughter, and Mother provided the same information.

---

[1]     *See* TEX. FAM. CODE § 161.001(b)(1)(k) (authorizing termination of parent-child relationship based on parent's execution of "unrevoked or irrevocable affidavit of relinquishment of parental rights").

17

Adams testified that Mother had registered for a psychiatric evaluation with the BES Group and was waiting for an appointment. The delay in completing the evaluation was due to the provider's availability. Adams agreed that Mother had provided a certificate showing completion of parenting and anger management courses before the start of trial. In addition, Adams received a copy of Mother's lease. But Adams had not received verification of Mother's employment or income. She had only seen emails from the Salvation Army regarding "the next steps in the hiring process."[2]

Adams further testified that Mother failed to complete individual therapy. And despite Mother having completed anger management classes in October 2020, Mother's "ongoing anger and aggression" demonstrated to Adams that Mother failed to "internalize[] the anger management therapy concept and goals[.]" Adams testified that Mother was unsuccessfully discharged from individual therapy because Mother "cursed [the therapist] out multiple times" in email communications. The therapist forwarded the emails to Adams and communicated to Adams that this was the reason Mother was unsuccessfully discharged shortly before trial.

Adams testified that Mother did not "consistently" show stability in her mood and behavior. Adams characterized Mother's knowledge regarding parenting as "off

---

[2]     Adams testified that she saw emails from the Salvation Army regarding "the next steps in the hiring process." Mother, however, testified that she had obtained employment at Goodwill.

18

and on." On some days, Mother was "perfect" and on others she was "irate," requiring Adams to ask her to "calm down, sit down with the baby."

After closing argument, the trial court terminated Mother's parental rights under Section 161.001(b)(1)(E) and (O) of the Texas Family Code and found that termination was in M.M.M.'s best interest. Mother appealed.

## Standard of Review

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[ ] in the care, custody, and control of [her] children ... is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, courts "strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . ., the evidence in support of termination must be clear and convincing[.]" *Holick*, 685 S.W.2d at 20. Clear and convincing evidence

is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review of the termination of parental rights, we determine whether the evidence, viewed in the light most favorable to the finding, is such that the factfinder could reasonably have formed a firm belief or conviction about the truth of the matter on which the Department had the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). But this does not mean we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable factfinder could form

a firm belief or conviction that the matter that must be proven is true, we must hold the evidence is legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review of the termination of parental rights, we determine whether, considering the entire record, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which the Department had the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

## Predicate Findings

In her first two issues, Mother contends there is legally and factually insufficient evidence to support the trial court's findings that she engaged in the predicate conduct set forth in Sections 161.001(b)(1)(E) and (O) of the Texas Family Code. *See* TEX. FAM. CODE § 161.001(b)(1)(E) (endangering conduct), (O) (failure to complete family service plan).

As stated above, to terminate the parent-child relationship, the Department must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the factfinder. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under [S]ection 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Because of the collateral consequences under subsection 161.001(b)(1)(M), which allows for termination as to other children based on a prior finding under subsection (D) or (E), we will review Mother's challenges to the sufficiency of the evidence as to subsection (E) first. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

## A.    Family Code Section 161.001(1)(E)—Endangering the Child

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Within this context, endangerment encompasses "more than a threat of metaphysical

22

injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. "Endanger" means to expose the child to loss or injury or to jeopardize his emotional or physical health. *Id.* (internal quotations omitted); *see also Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

We must look at a parent's conduct standing alone, including her actions or omissions. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). It is not necessary to establish that a parent intended to endanger the child. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). But termination of parental rights requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re J.W.*, 152 S.W.3d at 205. The specific danger to the child's well-being may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffers no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d at 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Courts may consider parental conduct that did not occur in the child's presence, including before the child's birth and after he was removed by the Department. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617.

**B.** **Analysis**

Mother presents several arguments in support of her contention that the record contained legally and factually insufficient evidence to support the trial court's finding that she endangered M.M.M. She contends that the sole evidence supporting that finding was her criminal conduct and that her incarceration, standing alone, was insufficient to support a finding under subsection (E). She also argues that her 2010 conviction and 2017 arrest were too remote to constitute evidence supporting endangerment of M.M.M., and that she made improvements through her family service plan showing she was not a danger to him. Finally, she argues that neither her criminal conduct nor her conduct during the pendency of the Department's suit was directed at M.M.M. or caused M.M.M. harm such that it could be used to support an endangerment finding under subsection (E). We disagree.

Here, the evidence shows that the trial court's finding is not based solely on evidence of Mother's incarceration, but on Mother's history of engaging in violent and abusive conduct toward others, both before and after M.M.M.'s birth, including hospital staff, Department staff, and service providers. *See In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, *8 (Tex. App.–Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (considering evidence of mother's hostility toward Department employees during case as evidence supporting endangerment finding);

*In Interest of P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at \*10 (Tex. App.—

Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (same).

When M.M.M. was two days old, the Department received a report that alleged neglectful supervision by Mother. The report stated that Mother had mental health issues, was violent, had a "history of acting out," and had threatened her neighbor with a knife and, as a result, been charged with aggravated assault with a deadly weapon when she was six months pregnant with M.M.M. The report also stated that Mother threatened "several" hospital staff during M.M.M.'s birth.

During one of her visits with M.M.M. after the Department took custody of him, and one month before trial, Mother "lashed out" at Adams and other Department staff. According to Adams, Mother did not like how the person transporting the child looked at Mother, and she spent "the entirety of the visit ranting, cursing, and yelling at [Department] staff," which interfered with her ability to enjoy her "bonding time with her baby." Adams further explained that Mother had arrived early for her visit and wanted to attend a part of Father's visit with M.M.M. When she was not permitted to do so, Mother "grew upset, confronted [Adams and others] in the hallway, [and] blocked [them] in the hallway." Adams testified that she had to delay the start of the visit until Mother calmed down. Although the visit eventually took place, it was "shortened significantly due to [Mother's] behavior." Adams did testify that, once the visit began, the interaction

25

between Mother and M.M.M. was "appropriate," and that Mother spent time "holding [M.M.M.], speaking to him, walking with him, keeping him engaged."

One day before trial, Mother was unsuccessfully discharged from her individual therapy sessions due to her behavior, which included "curs[ing] out . . . [and being] extremely abusive to the [service] provider." Specifically, Mother was discharged from individual therapy because she "cursed [the therapist] out multiple times" in email communications. Mother agreed that she became frustrated with the therapist over what she described as a "miscommunication" involving her meeting attendance via Zoom, and that she used profanity in her exchanges with the therapist, though she did not recall whether she "cursed [her] out."

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child." *In re R.W.*, 129 S.W.3d at 739. A parent's abusive or violent conduct can produce an environment that endangers the child's well-being. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.). While direct physical abuse clearly endangers a child, domestic violence, want of self-control, and a propensity for violence may also be considered as evidence of endangerment. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *16 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *see*

*also In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.) (considering parent's lack of self-control and propensity for violence and aggression). Evidence that a parent has engaged in abusive or violent conduct in the past permits an inference that the violent behavior will continue in the future. *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

In addition, Mother has a criminal history involving violent behavior—four arrests that include one charge (later dismissed) and two convictions for aggravated assault. The first conviction, from June 2010, was for aggravated assault with a deadly weapon. Mother was placed on probation for three years because of this conviction, although she claims the conviction arose out of an abusive relationship and that she acted in self-defense. She was later charged with aggravated assault in 2017, but this charge was dismissed because she "did it out of self-defense. The case got dismissed because it was out of self-defense because I was attacked by someone else." Mother's second conviction resulted from the 2019 incident, when Mother threatened her neighbor with a knife while she was six-months pregnant with M.M.M.. She was charged with aggravated assault with a deadly weapon and later convicted following her guilty plea. This incident resulted in her incarceration at the time of M.M.M.'s birth. Mother explained this incident was the result of an ongoing conflict with her neighbor that escalated on the day of her arrest, and that she had tried to involve the police but they refused to respond. Mother pleaded guilty to this

27

charge and was placed on five years' deferred adjudication. Nevertheless, she was incarcerated for about the first seven months of M.M.M.'s life.

"[E]vidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of [a] child." *In re S.R.*, 452 S.W.3d 351, 360–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (criminal offenses "significantly harm the parenting relationship" and "can constitute endangerment even if the criminal conduct transpires outside the child's presence"). Although incarceration alone will not support termination of parental rights, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment. *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *14 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (recognizing parent's imprisonment demonstrated deliberate course of conduct qualifying as endangering conduct). "An environment which routinely subjects a child to the probability that she will be left alone because her parent[ ] [is] once again jailed . . . endangers both the physical and emotional well-being of a child." *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

The fact that her arrests and convictions occurred before M.M.M.'s birth, or that none of her conduct involved physical injury to M.M.M., did not prohibit the

28

trial court from considering those facts as evidence of endangerment. As noted, it is not necessary to establish that a parent intended to endanger a child in order to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d at 270. The specific danger to a child's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the child and the child suffers no actual injury. *See Boyd*, 727 S.W.2d at 533. And courts may consider parental conduct that did not occur in a child's presence, including conduct before the child's birth and after the child was removed by the Department. *In re A.A.M.*, 464 S.W.3d at 426. The trial court could have inferred from the evidence related to Mother's pattern of abusive and violent behavior, even if that behavior was not directed at M.M.M. or occurred before his birth, that she engaged in a pattern of conduct that put M.M.M. in danger, or that she would engage in conduct in the future that would endanger M.M.M.

Mother points out that she engaged in and completed many of the services required of her in the family service plan, including parenting classes, anger management classes, and obtained housing and employment. We note that a parent's efforts to improve or enhance parenting skills are also relevant in determining whether a parent's conduct results in endangerment under subsection (E). *In re P.M.B.*, 2017 WL 6459554, at *10. Nonetheless, "evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a

long history of . . . irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, "[e]vidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future." *Jordan*, 325 S.W.3d at 724.

Although Mother completed many of the services required by her family service plan, and she had acted "appropriately" and attempted to bond with M.M.M. during her regular visits with him, the Department presented evidence that Mother was unsuccessfully discharged from her individual therapy due to aggressive behavior directed at her therapist, as detailed above. Moreover, this aggressive behavior occurred one day before trial began. The Department introduced further evidence that, although she had completed some services required by the plan, she had neither learned from the services nor embraced them. *See In re P.M.B.*, 2017 WL 6459554, at *10 (considering evidence Mother completed services, but failed to learn from those services, support for endangerment finding). For example, Adams testified that despite Mother completing anger management classes in October 2020, Mother's "ongoing anger and aggression" demonstrated to Adams that Mother failed to "internalize[] the anger management therapy concept and goals[.]"

Reviewing all the evidence in the light most favorable to the endangerment findings, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in conduct which endangered M.M.M.'s physical

or emotional well-being. Considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the endangerment finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that Mother engaged in conduct which endangered M.M.M.'s physical or emotional well-being. *See In re H.R.M.*, 209 S.W.3d at 108. Accordingly, we hold the evidence is both legally and factually sufficient to support the trial court's termination findings under Section 161.001(b)(1)(E). *See* TEX. FAM. CODE § 161.001(b)(1)(E). Accordingly, we overrule Mother's first issue.

Having determined that the evidence is sufficient to support the trial court's finding on this statutory ground, we need not consider whether the evidence would support termination of Mother's parental rights under subsection (O), the other predicate ground for termination challenged in Mother's second issue. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (affirming termination decree based on one predicate without reaching second predicate found by trier of fact and challenged by parent). Accordingly, we do not reach Mother's second issue.

### Best Interests of the Child

In her third issue, Mother contends there is legally and factually insufficient evidence to support the trial court's finding that termination of her parental rights was in M.M.M.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

## A.    Applicable Law

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). These factors are not exhaustive, and evidence is not required on all of them to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in Section 161.001(b)(1) can also be

considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (holding same evidence may be probative of both Section 161.001 grounds and best interest).

In addition, the Texas Family Code sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment, including:

- the child's age and physical and mental vulnerabilities;

- the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

- the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

- and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities.

*See* TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

**B.    Analysis**

Mother argues that the evidence is legally and factually insufficient to support the trial court's best interest finding because she "attended weekly visits with [M.M.M.] throughout the pendency of the case upon her release in October of 2020"; there was no evidence that she acted inappropriately or did anything during her visits that would have endangered M.M.M.; she was "capable of parenting [M.M.M.], she had the ability to care for [M.M.M.], and she had a place for [M.M.M.] to live; she

33

was willing to submit to "monitored placement"; there was no evidence M.M.M. had any special needs or suffered from any birth defects or abnormalities as a result of Mother's conduct; she completed parenting classes, and anger management classes; she never acted aggressively or violently toward M.M.M. or any other child; and neither incident where Mother "got upset at the Department . . . resulted in a physical altercation."

### 1. Child's Desires, Needs, and Proposed Placement

Applying the above factors, we note that M.M.M. was only a few days old when he was removed from Mother's care and eleven months old at the time of trial. Thus, he was too young to testify about his desires. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.). When a child is too young to express their desires, the factfinder may consider whether the child has bonded with the proposed adoptive family, is well cared for by them, and whether the child has spent minimal time with a parent. *See In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best interest determination. *See C.H.*, 89 S.W.3d at 28.

There was evidence introduced that Mother asked Adams for updates and pictures of M.M.M while incarcerated, attended weekly visits with M.M.M., brought M.M.M. clothing, diapers, and toys and attempted to bond with M.M.M., and engaged in "appropriate" behavior during their visits.

However, the trial court also heard testimony that M.M.M. was currently placed in a foster home and had been there since March 2020 shortly after his birth. Adams testified that M.M.M. was doing well, had no developmental delays, and was engaged in age-appropriate activities like infant swimming lessons. He was "eating very well, sleeping well, [and attending] daycare during the day to interact with other children his age." He was bonded to all members of his foster home and was "very happy and comfortable" in that home. Adams testified that M.M.M.'s foster mother provided appropriate care and took M.M.M. to his required medical appointments. M.M.M.'s foster home was prepared to provide M.M.M. with long-term care and to adopt him.

Croy testified that she attended virtual visits with M.M.M. while he was in his foster placement, and she had seen him in person at his daycare. She said M.M.M. was "doing very well in his current placement" and was "very bonded to his caregiver and her children." As to the foster mother, Croy testified, "That's [M.M.M.'s] mom. It's very clear that he sees that." Croy testified that the foster mother provided for all of M.M.M.'s health, physical, and emotional needs, that

M.M.M. had no developmental issues, and that he had grown and developed "a lot" while in his foster home. This evidence supports the trial court's best interest finding under the first, second, and seventh *Holley* factors.

### 2. Present and Future Emotional and Physical Danger to Child

The trial court heard testimony about Mother's aggressive and hostile outbursts toward Department caseworkers and staff and her verbally abusive behavior toward her therapist during the pendency of this suit. One incident occurred the day before trial began. The trial court also had before it evidence of Mother's criminal history, which included the aggravated assault with a deadly weapon conviction for which she was incarcerated at the time of M.M.M.'s birth, as well as a second conviction for aggravated assault with a deadly weapon and an aggravated-assault charge that was later dismissed. Although Mother argues that there was no evidence that she had any criminal history involving children, or that she ever acted aggressively or violently against M.M.M., a parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A parent's abusive or endangering conduct may be considered in a best interest analysis even when it occurred before the child's birth or was not directed at the child. *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The evidence of Mother's continued endangering conduct supports the trial court's best interest finding. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *16 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (mother's extensive history of violent abusive conduct directed at child, father, and other individuals, including Department employees and law enforcement officers, supported best interest finding); *In re P.M.B.*, 2017 WL 6459554, at *13 (parent's aggressive and hostile behavior throughout case supported best interest finding); *see also In re M.S.L.*, No. 14–14–00382–CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) (concluding father's series of crimes, including drug-related offenses and domestic violence occurring before and after children's births, supported trial court's best interest finding); *In re J.I.T.P.*, 99 S.W.3d at 846 (domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest); *In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (considering dismissed criminal charges relevant because mother was absent from child's life and unable to provide for child's physical and emotional needs each time she was jailed). This evidence supports the trial court's best interest finding under the third *Holley* factor.

### 3. Stability, Compliance with Services, Programs Available to Assist

Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination is in the child's best interest. *In re M.S.L.*, 2014 WL 5148157, at *8; *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home and employment, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re M.S.L.*, 2014 WL 5148157, at *8; *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Mother asserts that the evidence establishes that she "made great strides to prepare herself to reunite her family." Mother completed her psychological evaluation, her parenting classes, and anger management classes. She also obtained housing in January 2021, which was paid for through a public assistance program. Although she was not employed when trial began, she secured employment at Goodwill two days before trial resumed in March. Further, although she had not completed her psychiatric evaluation at the time of trial, she had completed the intake and was waiting on the provider availability.

However, there is also evidence that on two separate occasions Mother engaged in aggressive and hostile behavior directed at Department staff and her therapist, including one incident the day before trial. There is also evidence that, although she completed some services required by her family service plan, Mother

did not provide verification of income and failed to complete her individual therapy sessions due to her aggressive behavior. Further, although she completed anger management classes, she failed to demonstrate any learned behavior to help her control her anger, as evidenced by the examples of her violent and aggressive behavior directed at Department staff and her therapist. *See In re A.B.*, No. 01-16-00289-CV, 2016 WL 5110134, at *6 (Tex. App.—Houston [1st Dist.] Sept. 20, 2016, no pet.) (mem. op.) ("The failure to comply with a service plan can also support the trial court's best interest finding."); *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *9 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.) ("The Mother asserts she participated in parenting classes and a domestic violence awareness program, but she failed to demonstrate any learned behavior to help her parent her Children safely.")

Evidence of improved conduct, especially over a short duration, does not conclusively negate the probative value of a long history of violent behavior and inappropriate choices. *See In re J.O.A.*, 283 S.W.3d at 346; *see also In re J.F.C.*, 96 S.W.3d at 272 (termination of parental rights in child's best interest despite evidence "Mother found work," "parents' landlord . . . testified that their home was a 'safe environment,'" and "parents made attempts to comply with some parts of the trial court's order"); *In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *13–14 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (termination of

mother's parental rights in best interest of children because, although there was some evidence mother completed psychiatric evaluation, substance abuse treatment, parenting classes, anger management classes, and participated in individual therapy, there was also ample evidence she repeatedly tested positive for narcotics during case, failed to successfully complete service plan, and was unable to provide stable and permanent home for children).

Regarding the programs available to assist Mother, the record reveals that Mother had used various public assistance programs to secure housing and food, and would continue to use those programs to secure diapers and daycare services if she was reunited with M.M.M. But there was also evidence that Mother did not complete her family service plan, particularly her individual therapy requirement, and failed to seek out additional therapists after being discharged from her therapy program. Mother's failure to complete her individual therapy sessions is of particular importance because the reason M.M.M. came into the Department's care was related to Mother's violent and aggressive behavior, which resulted in her incarceration at the time of M.M.M.'s birth. Further, the purpose behind the requirement of her individual therapy sessions was to address her anger and adjustment disorder. *See In re J.-M.A.Y.*, Nos. 01-15-00469-CV, 01-15-00589-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.) (considering evidence that Mother was unsuccessfully discharged from drug counseling because

40

she had tested positive for cocaine as evidence supporting trial court's best interest finding in part, and particularly relevant, because "the reason the children came into the Department's custody was related to Mother's drug use"); *see also* TEX. FAM. CODE § 263.307(b)(11) (considering parent's willingness and ability to effect environmental and personal changes within reasonable period of time in determining child's best interest*); In re Z.B.*, No. 02-14-00175-CV, 2014 WL 5409103, at *9 (Tex. App.—Fort Worth Oct. 23, 2014, no pet.) (mem. op.) (parent did not take advantage of Department services offered to her); *Gammill v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00140-CV, 2009 WL 1423975, at *8 (Tex. App.— Austin May 22, 2009, pet. denied) (mem. op.) (parent's sporadic therapy attendance cast doubt on whether she would meaningfully avail herself of programs available to assist her). A factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her child that she does not have the ability to motivate herself to seek out available resources needed now or in the future. *See In re J.-M.A.Y.*, 2015 WL 6755595, at *7; *In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at *12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet.) (mem. op.). This evidence supports the trial court's best interest finding under the fifth, seventh, and eighth *Holley* factors.

In sum, the record contains sufficient evidence to support the best interest finding based on Mother's criminal behavior that resulted in periods of incarceration,

41

including her conviction for aggravated assault with a deadly weapon while she was six months pregnant with M.M.M., her aggressive and hostile behavior directed at Department staff and her service providers, her lack of stable employment, and her noncompliance with services. Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in M.M.M.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 265–66. Considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the best interest finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in M.M.M.'s best interest. *See In re H.R.M.*, 209 S.W.3d at 108. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in M.M.M.'s best interest. Accordingly, we overrule Mother's third issue.

## Conclusion

We affirm the trial court's decree of termination.


Amparo Guerra
Justice

Panel consists of Chief Justice Radack and Justices Rivas-Molloy and Guerra.